# STATE OF MICHIGAN

# COURT OF APPEALS

MURAD MANAGEMENT, INC.,

        Plaintiff-Appellant,

v

HASTINGS MUTUAL INSURANCE
COMPANY,

        Defendant-Appellee.

UNPUBLISHED
December 18, 2018

No. 339206
Oakland Circuit Court
LC No. 2016-150935-CB

Before: O'BRIEN, P.J., and TUKEL and LETICA, JJ.

PER CURIAM.

Plaintiff, Murad Management, Inc., appeals by right a trial court order granting summary disposition in favor of defendant, Hastings Mutual Insurance Company, pursuant to MCR 2.116(C)(10) and dismissing plaintiff's complaint. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Plaintiff manages a commercial office building and obtained an insurance policy for the premises from defendant. On or about March 11, 2015, a tenant of the building reported a water leak coming from the ceiling. Upon inspection, it was discovered that one or more of the trusses near the east end of the building failed, causing a portion of the roof surrounding an air-conditioning unit to visibly sag. The displacement of the roof also caused two water pipes to break and begin pouring water into a tenant's unit.

Plaintiff filed a claim with defendant and retained Edward Boryn, P.E., a structural engineer, to inspect the damage. After inspecting the roof on March 13 and 14, 2015, Boryn issued a brief letter stating:

> During this special structural inspection, it was confirmed that the East portion of the main roof had sagged approximately 8" at mid-span. Temporary wood shoring had already been installed to prevent this portion of the roof to sag any further. The other roof areas appeared to be unaffected by this recent event.
>
> The main roof was being supported by flat, prefabricated wood roof trusses with a clear span of approximately 35 feet. In the area of the excessive

-1-

sagging, several failed truss connections were found. Steel truss plates (bottom chord) were ripped and tension web members had become detached. All these are classic signs of the trusses being overloaded.

Based on this special structural inspection, it is my opinion that the excessive roof sag was caused by heavy snows which concentrated at the area under investigation. All of the main roof trusses are essentially the same, and have been in place for several years. Since the remaining main roof trusses are still intact, a reasonable conclusion would be that an abnormal event had occurred.

On March 30, 2015, Richard Serbowicz, P.E., inspected the building on defendant's behalf. Serbowicz prepared a detailed report documenting his observations, including evidence of prior truss repairs, "moisture staining, efflorescence, and corrosion of the metal plate connectors at the failed bottom chord truss panel points," and moisture-saturated areas that could be penetrated with a utility blade using "normal hand pressure." He also referred to a "historic aerial view of the building roof from Google Earth," dated May 9, 2010, that reflected dark staining on the damaged area of the roof caused by bio growth and sediment in areas of chronic ponding. Based on his inspection, Serbowicz reached the following conclusions:

[I]t is our opinion that the failure and subsequent downward displacement of the roof structure in the easterly portion of the building was due to a loss of strength of a number of truss panel point connections from long-term, chronic, moisture exposure and related deterioration. This led to an overload of the moisture-compromised bottom chord metal place connections at one or more trusses leading to load sharing and failure of additional trusses. The presentation of the failed trusses, as well as evidence of long-term chronic moisture intrusion and prior bottom chord damage, indicates the failure likely initiated at the vicinity of the bottom chord of the sixth to seventh truss from the east wall which resulted in load sharing to adjacent trusses and progressive failure of additional trusses to the east of these trusses.

It is our opinion that there is no proximate causal relationship between the roof failure and any specific weather-related event or occurrence. A review of the NOAA [National Oceanic and Atmospheric Administration] Interactive Snow Records on and about the reported date of loss indicates a maximum of 2" of modeled snow water equivalent. This equates to only 10.2 pounds per square foot of ground snow load. The maximum modeled snow water equivalent this past 2014-2015 winter season per the NOAA Interactive Snow Records in this geographic locale was maximum 3" of water on or about March 3, 2015. This equates to 15.6 pounds per square foot of ground snow load. These are not considered an extreme or damaging amount of snow for this geographic locale, where the design ground snow load is 20 pounds per square foot. We would expect an otherwise non-moisture-deteriorated and compromised roof structure to resist the expected service loads on the roof on the date of loss without failure.

The progressive sagging of the roof was also hastened by the approximate 500 pound to 600 pound rooftop unit located in the area of the roof failure. This added point loading on the roof structure contributed to long-term deflection of the roof and associated ponding of water on the roof. There was no indication that the roof structure had any special reinforcing provisions in the location for the [rooftop unit] on the roof above, which is coincident with the area of significant sag and failure of the roof structure.

Relying on Serbowicz's report, defendant denied plaintiff's claim with respect to the roof damage, reasoning that the claim was precluded by policy exclusions disallowing coverage for damage caused by "[w]ear and tear"; "[r]ust, or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself"; or "[c]ontinuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more." However, to the extent that plaintiff sought coverage for interior water damage stemming from the broken water pipes, defendant issued payment to plaintiff in the amount of $38,221.59.

Despite the partial denial of its claim, plaintiff replaced the entire roof, all of the trusses, and the roof-top air-conditioning unit. On January 8, 2016, plaintiff filed a two-count complaint against defendant. In Count I, plaintiff alleged that defendant breached the terms of the insurance policy when it denied coverage for the damaged roof. In Count II, plaintiff alleged that it was entitled to an appraisal to determine the extent of loss. After completion of discovery, the trial court granted defendant's motion for summary disposition. According to the trial court, there was no genuine issue of material fact that plaintiff's roof damage claim fell within the "exclusion for deterioration and continuous or repeated seepage or leakage of water . . . ." The trial court also rejected plaintiff's alternative reliance on an additional coverage provision applicable to "collapse," finding that there was no evidence of a collapse, as defined by the policy.

## II. STANDARD OF REVIEW

"We review de novo a trial court's decision on a motion for summary disposition to determine whether the moving party is entitled to judgment as a matter of law." *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 270; 826 NW2d 519 (2012). "In reviewing a motion brought under MCR 2.116(C)(10), we review the evidence submitted by the parties in a light most favorable to the nonmoving party to determine whether there is a genuine issue regarding any material fact." *Id*. "A genuine issue of material fact exists when the record leaves open an issue on which reasonable minds could differ." *Id*. at 270-271 (quotation marks and citation omitted). Preliminary issues involving the interpretation and construction of an insurance contract involve questions of law that this Court reviews de novo. *Allstate Ins Co v Muszynski*, 253 Mich App 138, 140-141; 655 NW2d 260 (2002).

Resolution of the issues in this case requires that this Court interpret the relevant provisions of the insurance policy. Similar to other contracts, "[a]n insurance policy must be enforced in accordance with its terms." *Frankenmuth Mut Ins Co v Masters*, 460 Mich 105, 111; 595 NW2d 832 (1999). "While [i]t is the insured's burden to establish that his claim falls within the terms of the policy, [t]he insurer should bear the burden of proving an absence of coverage."

*Hunt v Drielick*, 496 Mich 366, 373; 852 NW2d 562 (2014) (quotation marks and citations omitted; alterations in original). "Exclusionary clauses in insurance policies are strictly construed in favor of the insured." *Auto-Owners Ins Co v Churchman*, 440 Mich 560, 567; 489 NW2d 431 (1992). "However, [i]t is impossible to hold an insurance company liable for a risk it did not assume, and, thus, [c]lear and specific exclusions must be enforced." *Hunt*, 496 Mich at 373 (quotation marks and citations omitted; alterations in original).

III. ANALYSIS

A. CLAIM FOR APPRAISAL

Plaintiff argues that the trial court erred in granting summary disposition as to Count II of its complaint requesting an appraisal of damages because plaintiff was entitled to an appraisal in light of defendant's admission of liability for interior water damage. We agree.

Section E.2 of the policy provides, "If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss." The March 2015 loss resulted in damage to the building's roof, as well as interior water damage. Defendant's claims adjuster conceded at his deposition that the water damage was a covered loss and that it was not excluded under the policy. In addition, defendant conceded coverage when it sent a claim letter and check for $38,221.59 to plaintiff acknowledging that the policy covered the water damages. Plaintiff disputed the amount of damages. A public adjuster who prepared an estimate of damages also disagreed with the amount that defendant agreed to reimburse plaintiff.

The trial court erred by failing to address this issue in its opinion and order summarily dismissing plaintiff's complaint. The plain terms of the insurance policy provided that plaintiff is entitled to an appraisal regarding the interior water damage if the parties are unable to reach an agreement as to the value of the loss, as is the case here. Plaintiff filed a complaint containing a written demand for an appraisal of the loss. Accordingly, plaintiff was entitled to an appraisal to determine the value of the interior water damage attributable to the cause of loss for which defendant conceded liability, i.e., water damage caused by the broken water pipes. On remand, the trial court is directed to order an appraisal in accordance with the terms of the policy.

For the first time on appeal, defendant argues that plaintiff is not entitled to an appraisal of the interior water damage because it was not covered under the insurance policy. But after plaintiff submitted its claim, defendant admitted that "a water event" like that at issue here was not excluded. Defendant's adjuster testified that the policy provided coverage for the interior damage caused by the broken water pipes, which was why defendant issued the partial payment to plaintiff. Accordingly, defendant waived any argument that the water damage was excluded under the policy. "[A] waiver is a voluntary and intentional abandonment of a known right." *Quality Prod Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 374; 666 NW2d 251 (2003). Defendant is presumed to know its own insurance policy. By agreeing with plaintiff that the

water damage constituted a covered loss, defendant voluntarily and intentionally abandoned any argument that this water damage was excluded under the policy.[1]

## B. ROOF DAMAGES

Next, plaintiff argues that the trial court erred in granting summary disposition as to its claim for roof damages that occurred in March 2015.

Preliminarily, the parties dispute whether evidence concerning the opinion of Dr. David J. Eby, Ph.D., P.E., should have been considered by the trial court in the context of defendant's dispositive motion. In addressing a motion for summary disposition under MCR 2.116(C)(10), "[a]ffidavits, depositions, admissions, and documentary evidence offered . . . shall only be considered to the extent that the content or substance would be admissible as evidence to establish or deny the grounds stated in the motion." MCR 2.116(G)(6). At the summary disposition stage, the proffered evidence must be plausibly admissible in substance. See *1300 LaFayette East Coop, Inc v Savoy*, 284 Mich App 522, 526; 773 NW2d 57 (2009). However, the evidence need not be admissible in form, and all foundation for admission need not be laid at the summary disposition stage. *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 373; 775 NW2d 618 (2009).

Dr. Eby authored two written opinions. The first opinion, issued on December 9, 2015, agreed with Serbowicz's conclusion that the roof caved in "due to a loss of strength of a number of truss panel point connections from long-term, chronic, moisture exposure and related deterioration." Although we agree with plaintiff's contention that the December 9, 2015 letter amounted to hearsay, the content of the letter was plausibly admissible as an expert opinion under MRE 702. Neither party appears to dispute Dr. Eby's qualification as an expert. His opinion regarding Serbowicz's report and the cause of the roof damage, if presented in an admissible form, involved technical or specialized knowledge that would have assisted the trier of fact to understand the cause of the roof damage. Furthermore, on the existing record, it appears that Dr. Eby's opinion was based on sufficient facts or data, as well as proper application of reliable principles and methods. See MRE 702. Accordingly, the trial court did not err in considering Dr. Eby's letter in addressing the motion for summary disposition.

For similar reasons, Dr. Eby's subsequent retraction of his opinion should also have been considered by the trial court. In a letter dated June 15, 2017, Dr. Eby explained that, having reviewed additional information regarding the structure and loss, he no longer agreed with Serbowicz's opinion. Instead, he was unable to opine regarding the cause of the loss. It does not appear that the trial court considered Dr. Eby's second letter, and defendant argues that the omission was proper because plaintiff failed to produce the second letter in connection with the dispositive motion. We disagree.

---

[1] To the extent that defendant contends that some of the internal water damage was caused by water leaking through the roof rather than the water flowing from the broken pipes, it is a question of fact that remains unresolved at this time.

In considering a dispositive motion, a trial court "reviews the *entire record*" to determine whether the moving party is entitled to summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999) (emphasis added). In this case, plaintiff attached Dr. Eby's second letter to a reply in support of its motion in limine; the trial court heard the motion in limine and the motion for summary disposition at the same time.[2] Thus, the second letter was part of the record at the time the trial court decided the motion for summary disposition and the trial court erred in failing to consider the letter. See *id*.

With respect to the issue of coverage for the roof damage, the policy provides coverage for direct physical loss unless the loss is excluded under section B of the "CAUSES OF LOSS – SPECIAL FORM" or subject to other limitations. In pertinent part, section B.2 provides:

> **2.** We will not pay for loss or damage caused by or resulting from any of the following:
>
> * * *
>
> **d. (1)** Wear and tear;
>
> **(2)** Rust, or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;
>
> * * *
>
> But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" . . . we will pay for the loss or damage caused by that "specified cause of loss" . . . .

As used in this provision, the policy defines a "specified cause of loss" as including "weight of snow, ice or sleet; [or] water damage." In addition, "water damage" is defined to mean "accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance . . . that is located on the described premises and contains water or steam." As a separate exclusion, section B.2.f precludes coverage caused by or resulting from "[c]ontinuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more." The trial court cited Exclusions B.2.d(1) and (2), and B.2.f in granting defendant's motion for summary disposition.

"Exclusionary clauses in insurance policies are strictly construed in favor of the insured." *Churchman*, 440 Mich at 567. An "insurance company has the burden to prove that one of the policy's exclusions applies." *Auto-Owners Ins Co v Seils*, 310 Mich App 132, 146; 871 NW2d

---

[2] Although the trial court did not directly address the motion in limine at the hearing, we note that the motion was scheduled for hearing on the same day as defendant's motion for summary disposition.

530 (2015). Therefore, at the summary disposition stage, the insurer must show that there is no genuine issue of material fact that the exclusion applies. "A genuine issue of material fact exists when the record leaves open an issue on which reasonable minds could differ." *Cuddington*, 298 Mich App at 270-271 (quotation marks and citation omitted).

Both plaintiff and defendant submitted evidence of expert opinions in support of their respective positions regarding the cause of the roof damage. However, the opinions of both parties' experts were undermined to some extent when they were deposed. For instance, Serbowicz acknowledged that he did not inspect the property until approximately two or three weeks after the roof was damaged, during which time water had been flowing into the building. He was also unable to say with certainty whether some of the conditions he considered indicative of chronic moisture exposure and related deterioration existed before the loss, and he did not believe it was possible to predict the amount of ice or pooled water present on the depressed portion of the roof just before the loss. Boryn likewise agreed that he did not know how much weight accumulated on the roof before the damage occurred. Furthermore, Boryn did not consider weather reports before he arrived at his opinion. Nonetheless, his opinion remained the same after having reviewed those records. Boryn also conceded that photographs of the property reflected earlier water intrusion of unknown duration, though it must have been long enough for the wood to become saturated and then dry out. And, as discussed above, Dr. Eby's later opinion was inconclusive and, thus, did not lend weight to either party's position.

The record clearly consists of conflicting evidence as to the cause of the roof damage. The first two witnesses to observe the damaged roof testified that they saw snow and ice accumulation on the roof above the damaged area. As previously noted, the parties' experts disagreed about whether the damage was caused by overloading from the weight of snow and ice or deterioration in the trusses resulting from long-term moisture exposure. While both parties point to the inconsistencies and weakness of the opposing party's evidence, this goes to the weight of the evidence and the credibility of witnesses. *Bouverette v Westinghouse Electric Corp*, 245 Mich App 391, 401; 628 NW2d 86 (2001) ("[A]n opposing party's disagreement with an expert's opinion or interpretation of facts . . . are matters of the weight to be accorded to the testimony, not its admissibility."). Importantly, a trial court ruling on a motion for summary disposition is not permitted to assess witness credibility or determine disputed facts. *Lima Twp v Bateson*, 302 Mich App 483, 492; 838 NW2d 898 (2013). Viewing the evidence in the light most favorable to plaintiff, the nonmoving party, we conclude that there was a genuine issue of material fact as to the cause of the roof damage.

Specifically, there was an issue of fact as to whether the loss was excluded under the insurance policy. To the extent that defendant introduced evidence that the damage was caused by "wear and tear," rust, corrosion, decay, deterioration or defects in the property for purposes of Exclusions B.2.d(1) and (2), there was evidence that these excluded causes of loss resulted in a "specified cause of loss"—i.e., water damage or damage caused by weight of snow or ice. Similarly, while there was evidence that the damage was caused by "[c]ontinuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more," the conflicting evidence concerning causation left a genuine issue of material fact as to whether the loss was excluded under Exclusion B.2.f. The trial court, therefore, erred by granting defendant's motion for summary disposition with respect to plaintiff's roof damage claim.

## C. COLLAPSE COVERAGE

Next, plaintiff argues that the trial court erred in granting summary disposition as to its claim for coverage under the policy's collapse coverage provision.

The policy provides, in relevant part, as follows:

**D. Additional Coverage – Collapse**

The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in **D.1.** through **D.5.** below.

**1.** With respect to buildings:

**a.** Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose;

**b.** A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;

**c.** A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building;

**d.** A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

The trial court held that there was no evidence to show that a collapse occurred. We agree.

The evidence showed that a portion of the roof abruptly "caved in" for purposes of D.1.a. The verb "caved" is defined in relevant part as "to fall in or down esp. from being undermined — usu. used with *in*[.]" *Merriam-Webster's Collegiate Dictionary* (11th ed). The evidence showed that a portion of the roof abruptly fell in or down at the subject property. However, the policy further provides that a part of the building is not considered to have collapsed if that part of the building "is standing . . . even if it has separated from another part of the building." The policy also provides that a building is not considered to have collapsed "even if it shows evidence of . . . sagging . . . ." Reading these provisions together as a harmonious whole indicates that a "cave in" of the type at issue in this case—that is, a displaced or sagging roof that remains connected to the standing building—is not considered a "collapse" under the terms of the policy. Therefore, the trial court did not err in granting summary disposition in favor of defendant as to the issue of collapse coverage.

## D. ORDINANCE OR LAW COVERAGE

Finally, plaintiff argues that the trial court erred in granting summary disposition and dismissing its claim for coverage for removal and replacement of the entire roof under the insurance policy's "Ordinance or Law" coverage.

Plaintiff's insurance policy included a "DELUXE PROPERTY COVERAGE EXTENSION" form containing a provision entitled "Ordinance or Law Coverage," which provided, in relevant part, as follows:

> Coverage for Loss to the Undamaged Portion of the Building – If a Covered Cause of Loss occurs to covered Building Property shown in the Declarations, we will pay for loss to the undamaged portion of the building caused by enforcement of any ordinance or law that requires the demolition of the undamaged portion. The ordinance must be in force at the time of loss.

The trial court failed to address whether replacement of the undamaged portion of the roof fell within the scope of this coverage. This omission was presumably a result of the plain language of the provision, which conditions the ordinance or law coverage upon the occurrence of a covered cause of loss, coupled with the trial court's conclusion that there was no genuine issue of material fact as to the issue of coverage for the roof damage. Because we conclude that the trial court erred by ruling that there was no coverage for the roof damage as a matter of law, we decline to address this issue for the first time on appeal. Instead, on remand, the trial court should determine whether a genuine issue of material fact exists concerning whether plaintiff is entitled to coverage for the full roof replacement under the terms of the ordinance or law coverage. See *Wells Fargo Bank, NA v Null*, 304 Mich App 508, 540; 847 NW2d 657 (2014) (remanding issue to trial court for first determination where the issue was not addressed because of erroneous predicate ruling).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Jonathan Tukel
/s/ Anica Letica